Ballard WRIGHT; Faye
Wright, Appellants

v.

GENERAL ELECTRIC COMPANY,
Appellee.

No. 2006–CA–000080–MR.

Court of Appeals of Kentucky.

Nov. 30, 2007.

Robert H. Miller, II, Charleston, WV, for appellant.

Scott T. Dickens, Gregory Scott Gowen, Louisville, KY, for appellee.

Before ACREE and THOMPSON, Judges; ROSENBLUM,[1] Senior Judge.

## OPINION

ROSENBLUM, Senior Judge.

Ballard and Faye Wright appeal from an order of Greenup Circuit Court granting summary judgment to General Electric Corporation upon their common law tort claims for injuries allegedly sustained by Ballard from exposure to asbestos during his employment as a railroad worker for CSX Transportation, Inc., and its predecessor, Chesapeake & Ohio Railroad Company (C & O). The appellee, General Electric, designed and manufactured locomotives and provided component parts incorporated into the locomotives and railroad cars used by the railroad carriers. The Wrights allege that these locomotives and component parts contained asbestos to which Ballard was exposed, resulting in his contracting lung cancer.

The circuit court granted summary judgment to General Electric based upon its conclusion that common law tort claims against railroad component parts manufacturers, such as the appellee, are preempted by the Locomotive Boiler Inspection Act (LBIA). We agree that the claims are preempted and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Ballard worked for CSX and its predecessor, C & O, in Shelby, Kentucky, from 1947 to 1982. During his first four years of employment, he worked as a Helper on C & O's steam engines. His duties during this period included servicing the coal tenders on the engines, including removing and installing gaskets from the journal boxes, and removing and installing pipe insulation on the steam pipes.

Ballard believes the insulation on the steam pipes and the gaskets contained asbestos. He contends that removing and installing the pipe insulation created a significant amount of asbestos-containing dust, which he breathed. Ballard worked with and around pipe insulation on the steam engines on a daily basis from approximately 1947 to 1951. As a Helper, he also assisted with oil changes, handled oil pan gaskets, and worked on manifolds and gear boxes, which the Wrights also claim exposed him to asbestos.

From approximately 1951 to 1982, Ballard worked as a Freight Car Inspector. In that capacity, one of his primary jobs was testing air brakes. General Electric was one of the manufacturers of the air brakes used on the cars. During his years as an inspector Ballard, on a daily basis, observed from close proximity while other employees serviced diesel locomotive engines, including while they worked on the engines' intercoolers, crankcases, manifolds and bearings. Similarly, he observed from close proximity while oil changes were performed on the diesel locomotives. According to Ballard, his proximity and exposure to these tasks subjected him to asbestos.

As an inspector Ballard also observed from close proximity as asbestos-containing products such as pipe insulation, gaskets, brake shoes and packing were being installed on and removed from the locomotives. According to Ballard, these tasks

---

1. Senior Judge Paul W. Rosenblum, sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

created visible dust which he and his co-workers breathed. Ballard states that during his employment with CSX, he was never given any kind of protective breathing equipment.

According to Ballard, the General Electric steam locomotives-which were designed, manufactured, and sold by the appellee-were heavily insulated with asbestos. The diesel locomotives used by C & O and CSX from the late 1950s through Ballard's retirement were likewise manufactured by General Electric. Ballard alleges that these locomotives, too, contained asbestos-containing products, such as oil pan gaskets.

In January 2001, Wright was diagnosed with asbestos-related lung cancer. He attributes the disease to his exposure to asbestos during his employment by C & O/CSX, including his exposure to the steam and diesel locomotives designed and manufactured by General Electric.

On January 16, 2002, Ballard and Faye filed a Complaint in Greenup Circuit Court seeking damages for his lung cancer. The Complaint named 18 defendants, including CSX, General Electric, PneumoAbex Corporation[2] and Garlock Sealing Technologies, Inc.[3]

Among other things, the Complaint alleged that General Electric was negligent in that even though it knew of the dangers of exposure to asbestos, it failed to warn Ballard of the dangers and/or inform him of the precautions which should be taken to avoid injury. The Complaint also alleged that General Electric was subject to strict liability on the basis that the appellee placed into the stream of commerce an

asbestos-containing product (a) exposure to which caused lung cancer, and (b) with no or inadequate warning to users or persons exposed to the product.

In due course General Electric moved for summary judgment. On December 6, 2005, the circuit court entered an order granting the motion. The order concluded that the appellee was entitled to summary judgment on the basis that its common law tort claims sounding in negligence and strict liability were barred in that they were preempted by the federal Locomotive Boiler Inspection Act, 49 U.S.C.A. § 20701, et. seq. This appeal followed.

## STANDARD OF REVIEW

The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft,* 916 S.W.2d 779, 781 (Ky.App.1996); Kentucky Rules of Civil Procedure (CR) 56.03. "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue de novo." *Lewis v. B & R Corp.,* 56 S.W.3d 432, 436 (Ky.App.2001).

## DISCUSSION

The Wrights contend that the circuit court erred in its determination that their state common law tort claims are preempted by the LBIA. However, the overwhelm-

2. *See* Case No.2006–CA–000081–MR. Summary Judgment was granted to PneumoAbex upon the same grounds as in the present case. The decision in Case No.2006–CA–000081–MR was rendered the same day as the decision in the present case.

3. *See* Case No.2006–CA–000206–MR. Summary Judgment was granted to Garlock upon the same grounds as in the present case. The decision in Case No.2006–CA–000206–MR was rendered the same day as the decision in the present case.

ing weight of authority is that such claims are precluded, and, agreeing with the majority view, we affirm the circuit court's award of summary judgment to the appellee.

The provision of the LBIA under consideration, 49 U.S.C.A. § 20701, provides as follows:

A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

The issue presented is whether this federal statute preempts state common law tort claims sounding in negligence and strict products liability against a manufacturer of locomotives or locomotive component parts.

### ELEMENTS OF PREEMPTION

 The doctrine of federal preemption is derived from the supremacy clause of the United States Constitution, Article VI. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), determined that a state law that conflicts with federal law is without effect. However, the historic police powers of the state are not preempted in the absence of "the clear and manifest purpose of Congress" to do so. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The United States Supreme Court has stated that it is reluctant to interpret a federal statute in such a way as to find preemption of subjects traditionally governed by state law. *CSX Transportation v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Determination of whether a federal statute preempts a state cause of action depends on the purpose of Congress in enacting the federal statute. *Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978); *Niehoff v. Surgidev Corp.*, 950 S.W.2d 816, 820 (Ky.1997). "Congressional intent is the touchstone of all preemption analysis." *Keck v. Com. ex rel. Golden*, 998 S.W.2d 13, 15 fn. 4 (Ky.App.1999).

 The congressional purpose to preempt a state remedy may be determined in either of two ways. The first is whether the preemption is found in the express language of the statute. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The second is to find preemption implied from the structure and purpose of the statute. Implied preemption occurs when the state law actually conflicts with federal law or where the federal law so thoroughly occupies the legislative field that it may be reasonably inferred that Congress left no room for the state to supplement it. *Niehoff* at 820.

### PREEMPTION–LOCOMOTIVE BOILER INSPECTION ACT

The LBIA was first enacted in 1911. Being nearly a century old, the courts have had many occasions to consider the issue of its preemptive effect. The seminal case in the area is *Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926). By its own terminology the case considered whether "the [LBIA] has occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude

state legislation." *Id.* at 607, 47 S.Ct. 207. Writing for the Court, Justice Louis Brandeis answered the question as follows:

> [T]he power delegated to the [Interstate Commerce] Commission by the Boiler Inspection Act as amended is a general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances.
>
> . . . .
>
> The duty of the Commission is not merely to inspect. It is also to prescribe the rules and regulations by which fitness for service shall be determined. Unless these rules and regulations are complied with, the engine is not 'in proper condition' for operation. Thus the Commission sets the standard. By setting the standard it imposes requirements.
>
> . . . .
>
> We hold that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. Because the standard set by the Commission must prevail, requirements by the states are precluded, however commendable or however different their purpose.

*Id.* at 611–613, 47 S.Ct. 207.

■ In summary, *Napier*, 81 years ago, substantially answered the question we are now considering. Pursuant to *Napier*, the LBIA was "intended to occupy the field" in its area of coverage, with the field occupied encompassing "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances."

■ Citing us to *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) and *Silkwood v. Kerr–McGee Corp.* (1984) 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the Wrights contend that more modern preemption jurisprudence has undermined the continuing viability of *Napier*. However, even if preemption jurisprudence has evolved, nevertheless, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals [and state courts applying federal law] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997); *Scheiding v. General Motors Corp.*, 22 Cal.4th 471, 478, 993 P.2d 996, 1000, 93 Cal.Rptr.2d 342, 347 (Cal.2000) (discussing the argument of whether modern preemption jurisprudence has weakened *Napier*). Thus we believe *Napier* remains the controlling Supreme Court case in the area of LBIA preemption.

Furthermore, decisions subsequent to *Napier*, including recent decisions addressing the issue of asbestos-containing component parts, have concluded that *Napier* remains the controlling case upon the question of LBIA preemption. *See, e.g., Scheiding v. General Motors Corp.*, 22 Cal.4th 471, 993 P.2d 996, 93 Cal.Rptr.2d 342 (2000) (Boiler Inspection Act preempts employees' product liability actions against a manufacturer of locomotives containing asbestos materials); *Seaman v. A.P. Green Indus., Inc.*, 184 Misc.2d 603, 707 N.Y.S.2d 299 (Sup.Ct.2000) (Boiler Inspection Act preempts claims made by employees against manufacturers of train components containing asbestos); *Key v. Norfolk Southern Ry. Co.*, 228 Ga.App. 305, 491 S.E.2d 511 (1997) (Boiler Inspection Act preempts common law claims against rail-

road by employee injured in fall from locomotive steps); *Springston v. Consolidated Rail Corp.*, 130 F.3d 241 (6th Cir.1997) (Boiler Inspection Act preempts state law negligence claims for inadequate warning devices on locomotive in action brought by motorist struck by train); *First Security Bank v. Union Pacific R. Co.*, 152 F.3d 877 (8th Cir.1998) (Boiler Inspection Act preempts claim for inadequate warning horn); *Oglesby v. Delaware & Hudson Ry.*, 180 F.3d 458 (2d Cir.1999) (Boiler Inspection Act preempts employee common law claims against locomotive seat manufacturer); *Forrester v. American Dieselelectric, Inc.*, 255 F.3d 1205 (9th Cir. 2001) (Boiler Inspection Act preempts non-employee product liability actions against a manufacturer of locomotive cranes); *In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama, on September 22, 1993*, 188 F.Supp.2d 1341 (S.D.Ala.1999) (Boiler Inspection Act preempts passenger and employee common law negligence and design-defect claims against Amtrak); *Roth v. I & M Rail Link, L.L.C.*, 179 F.Supp.2d 1054 (S.D.Iowa 2001) (Boiler Inspection Act preempts state common law tort claims against manufacturer of locomotive cab in action brought by widow of employee crushed in collision); *Bell v. Illinois Central R.R.*, 236 F.Supp.2d 882 (N.D.Ill.2001) (Boiler Inspection Act preempts passengers' state law claims against locomotive manufacturer); and *In re West Virginia Asbestos Litigation*, 215 W.Va. 39, 592 S.E.2d 818 (W.Va.2003) (State tort law claims against manufacturers of parts or components of railroad locomotives are preempted by federal law under the Locomotive Boiler Inspection Act).

*Cf. Engvall v. Soo Line Railroad Co.*, 632 N.W.2d 560 (Minn.2001) (Boiler Inspection Act does not preempt state common law actions based upon a violation of the Act, thus a railroad may bring a state law contribution claim against a manufacturer of a railroad locomotive); *Lorincie v. Southeastern Pennsylvania Transp.*, 34 F.Supp.2d 929 (E.D.Pa.1998) (Boiler Inspection Act does not preempt state common law claims against railroad manufacturers that are not also carriers).

■ Ultimately, we agree with *Napier* and the decisions which have continued to follow its holding in lawsuits such as the one at bar (which overwhelmingly represent the majority rule), and conclude that the LBIA bars state common law tort claims against carriers, locomotive manufacturers, and locomotive component part manufacturers.

## PREEMPTION AS APPLIED TO MANUFACTURERS

Despite the majority view upon the issue, the Wrights nevertheless argue that their state common law tort claims may be brought. First, in overlapping arguments, the Wrights maintain that their claims are valid because "Congress expressly excluded manufacturers from regulation under the [LBIA's] predecessor, the Boiler Inspection Act;" and because "[General Electric] has never been regulated by the [LBIA]."

Another important case in the area of LBIA preemption, *Law v. General Motors Corp.*, 114 F.3d 908 (9th Circ.1997), addressed whether the Act's preemptive reach, as defined by *Napier*, extends to common law tort claims (including the claims at bar) against manufacturers of locomotive component parts. *Law* addressed the issue as follows:

> Appellants' common-law claims fall squarely within this preempted field. Apart from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of

care established by the state. *See San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959) ("The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."). A railroad equipment manufacturer found to have negligently designed a braking system, for example, is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress's goal of uniform, federal railroad regulation would be undermined. *See id.* ("Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.").

. . . .

This distinction-founded on the fact that the BIA speaks only to "railroad carrier[s]" and not manufacturers, *see* 49 U.S.C. § 20701-is without significance. The BIA preempts any state action that would affect "the design, the construction, and the material" of locomotives. *Napier,* 272 U.S. at 611, 47 S.Ct. 207. Imposing tort liability on railroad equipment manufacturers would do just that, by forcing them to conform to design and construction standards imposed by the states. This would transfer the regulatory locus from the Secretary of Transportation to the state courts-a result the BIA was clearly intended to

foreclose. [footnote omitted] *See Taylor AG Indus. v. Pure–Gro,* 54 F.3d 555, 561 n. 3 (9th Cir.1995) (preemption analysis "focuses not on whom the legal duty is imposed, but on whether the legal duty constitutes a state law requirement" already covered by federal law).

*Id.* at 910–912.

We agree with the discussion of the issue as stated in *Law.* In summary, we are not persuaded that the LBIA's preemptive reach does not extend to locomotive manufacturers and locomotive component part manufacturers.

## APPLICATION OF LBIA DURING BALLARD'S EMPLOYMENT HISTORY

■ The appellants argue, in the alternative, that even if the LBIA now preempts state common law tort claims, it did not do so during the period Ballard worked for C & O/CSX. They base this argument upon the contention that the penalty provisions of the Act were not extended to "owners, manufacturers and lessors" until 1988. As previously noted, Ballard's employment as a railroad worker extended from 1947 through 1982.

For the reasons already discussed, we disagree. The same preemption principals as stated in *Napier* and *Law,* as set forth above, likewise applied during Ballard's work years. As established in *Napier,* the LBIA was from its inception intended to occupy the field. Further, it is a fundamental principal of preemption that a state may not circumvent preemption by accomplishing through jury verdicts what it cannot accomplish through direct legislation. And as explained in *Law,* to accomplish the preemptive purpose of the LBIA, it is necessary for its reach to extend to manufacturers. As such, we disagree with the premise of this argument. To the con-

trary, the preemption aspect of the LBIA applies to General Electric vis-a-vis Ballard's tenure as a railroad worker.

## APPLICATION OF FELA STANDARD TO LOCOMOTIVE MANUFACTURERS

■ The Wrights allege that preemption should not be applied to locomotive manufacturers but, instead, they should be subjected to the liability standards imposed upon railroad carriers by the Federal Employees Liability Act (FELA).[4] For the reasons already set forth, this argument is without merit.

■ The Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., allows railroad workers to recover against their *employers* for occupational injuries. *Law* 114 F.3d at 912. FELA authorizes recovery of compensatory damages—including pain and suffering—when the employer's "negligence played any part, even the slightest, in producing the injury." *Id.* (citing *Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)). Thus, subjecting locomotive manufacturers to the FELA standard would be the antithesis of preemption.

If anything, the availability of a remedy under FELA supports the view that lawsuits against locomotive manufacturers are preempted by the LBIA. The low standard for recovery by an injured railroad employee against his employer-carrier illustrates that "the federal government has established a comprehensive mechanism for vindicating the rights of railroad workers-a mechanism that doesn't undermine the [LBIA's] goal of uniformity." *Law* 114 F.3d at 912. In summary, we are not persuaded that locomotive manufacturers should be subject to lawsuit for state common law tort claims under the FELA standard.

## CLAIMS BASED UPON VIOLATIONS OF LBIA

■ The Wrights further contend that their claims are not barred because claims based upon violations of the LBIA are not preempted by the Act. More specifically, the Wrights argue that "[a]ppellants are not alleging that GE defectively designed locomotives. The Appellants' claims are based on the manufacturing defect of using products containing asbestos on the locomotives."

The Wrights have failed to cite us to their preservation of this issue in the circuit court record as required by CR 76.12(4)(c)(v). Moreover, we do not construe their pleadings as alleging a manufacturing defect. Accordingly, we are persuaded that this issue is not properly preserved for our review.

■ In any event, a manufacturing defect is defined as a deviation from the product's design that creates an unreasonable risk of harm. *See Edwards v. Hop Sin, Inc.,* 140 S.W.3d 13, 15 (Ky.App.2003). The only evidence of record is that the component parts at issue were designed to include the use of asbestos. As such, the component parts were manufactured as designed and, by definition, any defect was a design defect, not a manufacturing defect. The Wrights cite us to no evidence contained in the record which would establish that there is a genuine issue of material fact upon this issue. It follows that, even if the issue were preserved, summary judgment upon the issue of any alleged manufacturing defect was proper. *See Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476 (Ky.1991).

**4.** The Wrights have filed a FELA claim against CSX as a part of the present lawsuit.

*CONCLUSION*

For the foregoing reasons the judgment of the Greenup Circuit Court is affirmed.

ALL CONCUR.